UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

WOODROW MIMS,                    )
                                 )
          Plaintiff              )
                                 )
     v.                          )  CAUSE NO: 2:10-cv-130
                                 )
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,              )
                                 )
          Defendant              )

## OPINION AND ORDER

This matter is before the court on the petition for judicial
review of the decision of the Commissioner of Social Security
filed by the claimant, Woodrow Mims, on October 10, 2008.  For
the reasons set forth below, the decision of the Commissioner is
AFFIRMED.

## Background

The claimant, Woodrow Mims, applied for Disability Insurance
Benefits on March 9, 2007, alleging a disability onset date of
October 1, 2005.  His claim initially was denied on June 6, 2007,
and again denied upon reconsideration on August 30, 2007.  (Tr.
67, 81)  Mims requested a hearing before an Administrative Law
Judge ("ALJ").  (Tr. 72, 56)  A hearing before ALJ Joel Fina was
held on April 6, 2009, at which Mims, medical expert Dr. Bernard
Stevens, and vocational expert Grace Gianforte testified. (Tr. 9,
10)

On April 28, 2009, the ALJ issued his decision denying bene-
fits. (Tr. 53) The ALJ found that Mims was not under a disabil-
ity within the meaning of the Social Security Act from October 1,
2005, through the date he issued his decision. (Tr. 53) Follow-
ing a denial of Mims' request for review by the Appeals Council,
he filed his complaint with this court.

Mims was born on November 14, 1949, making him 59 years old
on the date of the ALJ's decision. (Tr. 141) He is 5'11" in
height and weighs approximately 245 pounds. (Tr. 12) Mims is
single with no minor children and resides by himself. (Tr. 12)
He has a 12th grade education and last worked as a pipe fitter
and plumber in HVAC with Inland Steel in July of 2002. (Tr. 12,
62) Mims held this position for 32 years prior to retiring, in
part, because he no longer could lift pipes, which weighed up to
70 pounds, and refrigeration tanks, which weighed up to 40
pounds. (Tr. 12, 25-27) Mims looked for other work but stopped
when he began to lose the ability to bend his joints in 2007.
(Tr. 13)

Mims was diagnosed with diabetes, hypertension, inconti-
nence, osteoarthritis, and asthma. (Tr. 217, 17, 239, 317) Mims
had a long standing problem with diabetes and hypertension. (Tr.
217) In September 2005, he saw Dr. Shanti Bansal at the Univer-
sity of Chicago Hospital for acid reflux. (Tr. 351-52) Upon

examination, Mims had clear lungs, a normal heart rate, and no edema. (Tr. 349-50) Mims' blood sugar and blood pressure were elevated, and he was prescribed new medications for his hypertension and diabetes. (Tr. 346)

Mims saw Dr. Bansal in October, November, and December 2005. (Tr. 345-350) All three examinations generally were normal, except his blood sugar and blood pressure were elevated. (Tr. 345-350) Dr. Bansal increased the dosage of Mims' medications at the October and December 2005 examinations. (Tr. 345-46, 349-50)

Mims saw Dr. Bansal in January 2006 for a routine follow-up. (Tr. 221-22) Mims reported that his medications provided good control of his blood sugar and hypertension. (Tr. 222) Dr. Bansal scheduled a prostate screening test and during his following month's check up, recommended that Mims schedule an appointment with a urologist for a prostate biopsy. (Tr. 222) In February 2007, Mims was diagnosed with prostate cancer and was surgically treated in March 2007. (Tr. 226-27) Following the surgery, Mims experienced stress incontinence. An x-ray of Mims' bladder was normal and showed no evidence of leaking. (Tr. 232-235) However, a March 5, 2007 CT scan revealed mild degenerative changes of the pelvis. (Tr. 239)

On May 21, 2007, consulting physician Teofilo Bautista performed a physical examination of Mims at the request of the

state disability and determination bureau. (Tr. 287-290) Mims complained that he developed pain in both thighs and occasional urinary incontinence after his prostate surgery. (Tr. 287) He took Ultram and extra-strength Tylenol as needed. (Tr. 287) He also complained that he had a ten year history of diabetes for which he took medication. (Tr. 287) Mims also took medication for hypertension. (Tr. 287) He reported that he could walk for one block, sit or stand for 30 minutes at a time, lift less than five pounds, and climb four steps. (Tr. 287)

Dr. Bautista observed that Mims refused and could not perform range of motion testing on his back, hips, and thighs due to complaints of pain in his pubic area. (Tr. 288-290) He had a limited range of motion in his wrists, but full range of motion in all other joints. (Tr. 288-290) He could not walk heel to toe or tandem. (Tr. 288-290) Mims had a tingling sensation in the fingertips of both hands but good grip strength and fine finger manipulation. (Tr. 288-290) He walked slow, without a limp or assistive device, had a normal heart rate, clear lungs, full muscle tone and strenth in his arms and legs, and intact reflexes. (Tr. 288-290) Dr. Bautista's impression was that Mims suffered from hypertension, high cholesterol, Type II diabetes mellitus, and had a history of pain in both thighs because of his

previous surgery.  (Tr. 289)  Dr. Bautista did not provide any functional limitations.  (Tr. 289)

Dr. J. Sands reviewed Mims' file on June 1, 2007, and stated that his file "show[ed] durational post prostate cancer surgery" and his assessment was "not severe".  (Tr. 297) Dr. B. Whitley also reviewed Mims' file and affirmed Dr. Sands' opinion.  (Tr. 312)

Mims saw Dr. Nitin Gera on February 18, 2008, for the dyspnea he was experiencing over the past six months.  (Tr. 317-18)  Mims complained that he could not walk more than two blocks without experiencing shortness of breath and that he had pain in his legs which was resolved with rest.  (Tr. 317)  Dr. Gera observed that Mims had a regular heartbeat, no edema, and clear lungs, and ordered a pulmonary function test (PFT), chest x-ray, and spine and hip x-ray.  (Tr. 317-18) The x-ray of Mims' lumbar spine and hips showed mild osteoarthritis in both hips and osteophytes at levels L2-L5 in the lumbar spine.  The chest x-ray revealed degenerative abnormalities of the spine.  (Tr. 329)

The following month, Mims complained to Dr. Gera of urinary incontinence and shortness of breath.  (Tr. 319-20)  Dr. Gera noted that Mims' symptoms were somewhat limiting, but stable. (Tr. 320)  He prescribed an additional medication to treat Mims'

elevated hypertension and ordered a CT scan that showed signs compatible with asthma. (Tr. 320, 336)

At his follow up appointment the next month, Mims reported that his blood sugar was under control. (Tr. 321-22) Mims' lung diffusion capacity (DLCO) was markedly low, but prior pulmonary functioning tests (PFTs), chest x-rays, and a chest CT showed normal or mild findings. (Tr. 321, 340-41) Dr. Gera referred Mims to a pulmonary specialist, indicating that Mims might be anemic. (Tr. 321-22)

Mims saw Dr. May Lee at the hospital's pulmonary clinic in May 2008. (Tr. 323-24) He complained of shortness of breath since 2002, with more severe symptoms following his surgery, made worse by exertion. (Tr. 323) Dr. Lee noted that Mims' PFTs were mild and that his low DLCO was not explained by his slight anemia or other normal objective tests. (Tr. 324) Dr. Lee prescribed an Albuterol inhaler for Mims to use before activity and ordered another full set of PFTs. (Tr. 324)

Mims saw Dr. Lee for a follow-up appointment in June 2008. Mims' PFTs showed further lung restriction and a small further decline in his DLCO. (Tr. 327, 342) The cause of his symptoms was unclear, so Dr. Lee ordered more PFTs and another CT scan of Mims' chest. (Tr. 327) In October 2008, Dr. Lee's examination of Mims revealed that he had clear lungs, a normal heart rate, and

no edema. (Tr. 356-57) Dr. Lee attributed Mims' symptoms to several factors, including deconditioning, possible respiratory weakness, and some abdominal obesity. (Tr. 357) Dr. Lee noted that the cause of Mims' pulmonary restriction still was unclear. (Tr. 357) However, the October 2008 CT scan revealed marked coronary artery calcifications and thickening of the lungs' air-ways that remained unchanged from the March 2008 CT scan. (Tr. 359)

Mims saw Dr. Joseph Lodato in January 2009 for shortness of breath, primarily occurring during exertion. (Tr. 358) Mims also complained of pain in his right shoulder and had a limited range of motion. (Tr. 358) Dr. Lodato observed that Mims was obese, his lungs crackled, and he had slight edema in his feet, but a normal heart rate, reflexes, and muscle strength. (Tr. 358-59) Mims' echocardiogram also produced normal results. (Tr. 359) Dr. Lodato concluded that Mims' shortness of breath could be equiva-lent to angina and recommended an angiography to better view whether Mims had obstructive coronary artery disease. (Tr. 359) Mims refused the angiography and was prescribed Lasix, an anti-diuretic. (Tr. 359) Subsequent tests showed evidence of left ventricular hypertrophy. (Tr. 397-399)

At the hearing before the ALJ, Mims testified that he thought about finding work but that he could not bend and was

losing the ability to use his joints.  (Tr. 13) He generally was able to take care of his personal needs, but he could not wash his feet, put on socks, or tie his shoes.  Mims had to sit to wash dishes and sometimes could cook.  (Tr. 14-15)  Mims drove, but had to have his son assist him with grocery shopping to carry the groceries.  (Tr. 14-15)  Mims' hobbies included talking on his CB radio 15 to 20 minutes daily, watching television three to four hours a day, and going to the casino twice a month.  (Tr. 16)

Mims further testified that he experienced incontinence when he lifted things, could stand or walk for ten or 15 minutes at a time, and could walk only 30 to 40 feet before getting short of breath.  (Tr. 17, 23)  He had to wear under garments for his incontinence.  (Tr. 24)  Mims stated that he had pain in his back, left side, right arm, and thighs.  (Tr. 18-19, 25) His thigh pain increased when he stood for ten or 15 minutes, and he got fluid around his ankles.  (Tr. 23, 26) Mims could not raise his right arm over his head.  (Tr. 25)  He took medicine for depression, an inhaler, and water pills, among other medications. (Tr. 20, 24, 26) He also had been diagnosed with hernias that have been left untreated.  (Tr. 24)

Dr. Bernard Stevens, an internist endocrinologist, testified at the hearing as a medical expert.  (Tr. 27) He stated that

Mims' March 2008 PFT was borderline normal, indicating he had a mild degree of chronic obstructive lung disease or asthma. (Tr. 29) His May 2008 PFT revealed either a mild degree of asthma or Chronic Obstructive Pulmonary Disease (COPD). (Tr. 29) He also had osteoarthritis in his hips and lumbar spine. (Tr. 29) Mims continued to have stress incontinence from his prostatectomy. (Tr. 29) The ME could not tell the ALJ anything about Mims' right arm pain or ankle edema because they were not well developed in the record. (Tr. 29) The ME concluded that Mims had low back pain due to degenerative changes, age related changes, some osteoarthritis of his hips, and COPD. (Tr. 29) Mims also had a prostatectomy that caused occasional incontinence. (Tr. 30) The ME could not comment on Mims' mental condition. (Tr. 30) Based on these observations, the ME concluded that Mims' medical conditions did not meet or equal a listing. (Tr. 30) The ME limited Mims to restricted light work, stating that he could lift 20 pounds occasionally, ten pounds frequently, could sit, stand or walk for six hours, and only could do posturals occasionally because of his incontinence. (Tr. 31) Mims had to avoid ladders and scaffolds, but could stoop, bend, kneel, crouch or crawl occasionally. (Tr. 31) The ALJ did not place any additional manipulation restrictions on Mims because he found that there was no evidence in the file to support his complaints about right arm

9

pain. (Tr. 31) Finally, he restricted his environmental expo-
sure from high heat, humidity, and atmospheric pollutants. (Tr.
31)

VE Grace Gianforte was last to testify. (Tr. 32) The ALJ
posed a series of hypothetical questions. (Tr. 34-38) First,
the ALJ asked the VE about the existence of jobs for a person of
Mims' age, education, work experience, and skill set who was able
to lift up to 50 pounds occasionally, lift and carry 25 pounds
frequently in medium work, occasionally climb ladders, ropes or
scaffolds, occasionally crawl, must avoid concentrated exposure
to extreme heat, wetness, and humidity, and must avoid concen-
trated exposure to environmental irritants such as fumes, odors,
dust, and gases. (Tr. 34) The VE responded that Mims could not
perform his past relevant work as a pipe fitter but that there
were transferable skills to light and medium jobs, but no trans-
ferable skills to sedentary work. (Tr. 34) At the medium
exertional level, the individual could be a Filling Machine
Operator (6,000 jobs) or a Production Machine Tender (18,000
jobs). (Tr. 34)

The ALJ's second hypothetical assumed an individual with
Mims' age, education, work experience and skill set who was able
to lift up to 20 pounds occasionally, ten pounds frequently, sit,
stand, or walk for no more than six hours in an eight hour day,

never climb ladders, ropes or scaffolds, occasionally climb ramps or stairs, occasionally stoop, crouch, kneel, or crawl, must avoid concentrated exposure to extreme heat, wetness, or humidity, and must avoid concentrated exposure to environmental irritants, including fumes, odors, dust, and gases. (Tr. 35) The VE answered that there would be transferrable skills to light jobs, including Inspector/Testor jobs (2,800 jobs) and Quality Control Technicians (6,000 jobs). (Tr. 35)

The third hypothetical the ALJ posed assumed all of the same factors and limitations as the last hypothetical with the additional limitation of simple, routine and repetitive tasks. (Tr. 37) The VE responded that there would be no transferrable skills. (Tr. 37) If the claimant could not sustain work activity for eight hours a day, five days a week, for a 40 hour work week, work would be available only if he did not exceed the customary levels of absences that businesses tolerate, 1.3 days per month for the private sector and 1.6 days per month from the public sector. (Tr. 38)

In his decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. (Tr. 57-58) In step one, the ALJ found that Mims had not engaged in substantial gainful activity since October 1, 2005, his alleged onset date, through the date he was last

insured.  (Tr. 58)  At step two, the ALJ found that Mims had the following severe impairments: asthma, osteoarthritis, diabetes mellitus, hypertension, and status post prostatectomy due to adenocarcinoma with stress incontinence.  (Tr. 58) At step three, the ALJ found that Mims' impairments did not meet or medically equal one of the listed impairments. (Tr. 59)  In particular, Mims' asthma did not meet or medically equal any of the Category 3.00 respiratory impairments, his osteoarthritis did not meet or medically equal any of the Category 1.00 musculoskeletal impairments, and the impairment of status post prostatectomy due to adencarcinoma with stress incontinence did not meet or equal any of the Category 13.00 Neoplastic impairments.  (Tr. 59)

In determining Mims' RFC, the ALJ stated that he considered the entire record and found that Mims had the capacity to perform light work, involving lifting and carrying objects up to 20 pounds occasionally and ten pounds frequently, sitting, standing, and walking for six hours in an eight hour work day with postural limitations including avoiding climbing ladders, ropes, and scaffolds.  (Tr. 60) The ALJ further found that Mims occasionally was able to climb ramps and stairs, stoop, crouch, kneel, and crawl, but must avoid concentrated exposure to extremes of heat, wetness, humidity, fumes, odors, dust, and gases.  (Tr. 60)

In reaching this determination, the ALJ first discussed Mims' mental health, noting that the examining physician found that Mims' mood was dysphonic, he seemed discouraged, but not tearful, he was coherent, organized, had good eye contact, and did not exhibit bizarre behavior. (Tr. 60) The examining psychologist diagnosed Mims to have adjustment disorder with depressed features, diabetes, hypertension, and social issues due to family losses and a limited support system. (Tr. 60) The ALJ next discussed the Medical Internal examination Dr. Bautista performed on Mims. (Tr. 60) Dr. Bautista noted that Mims' examination was essentially unremarkable with diagnoses of hypertension, hyperlipidemia, type II diabetes mellitus, a history of numbness of the fingertips, a history of prostate cancer, a history of prostate surgery, depressive disorder, and a history of pain in both thighs following the prostate surgery. (Tr. 61) The ALJ went on to discuss Mims' history with dyspnea on exertion after walking two blocks and leg pain that resolved with rest. (Tr. 61) The examining physician, Dr. Edward Naureckes reported that the etiology of the claimant's symptoms was unclear and that it was mainly his legs and fatigue that limited his mobility. (Tr. 61) Mims had a low DLCO which was not explained by the echocardiogram or CT scan. (Tr. 61) Mims' symptoms were episodic, due in part to deconditioning, and were

treated with an inhaler. (Tr. 61) In October 2008, Mims reported that his breathing was better, he was able to walk more, and his inhaler helped with his symptoms. (Tr. 61)

The ALJ next considered Mims' daily activities and ability to care for himself. (Tr. 61) He reported that he was able to care for his personal hygiene but was unable to wash his feet because he could not bend. (Tr. 61) He could performed household chores, including cooking, laundry, and grocery shopping with his son, but had to sit down when he washed dishes. (Tr. 61) Mims talked on his CB radio, went to the casino, watched television, had a valid drivers license, and drove. (Tr. 61)

The ALJ went on to state that "based on the aforementioned medical evidence, the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessed herein." (Tr. 61) The ALJ explained that Mims' right arm pain was not substantiated by the medical evidence and that Mims' stress incontinence was addressed in the residual functional capacity by the occasional postural limits. (Tr. 62) The ALJ concluded by discounting the opinion

14

of Mims' treating physicians and assigning greater weight to the
opinion of Dr. Stevens, the independent medical expert. (Tr. 62)

With the RFC determined, at step four the ALJ found that
Mims could not perform his past relevant work. (Tr. 62) At step
five, the ALJ found that considering Mims' age, education, work
experience, and RFC, there were a significant number of jobs
available in the national economy that he could perform, includ-
ing inspector/tester (2,800 jobs) and quality control technician
(6,000 jobs). (Tr. 63)

## Discussion

The standard for judicial review of an ALJ's finding that a
claimant is not disabled within the meaning of the Social Secu-
rity Act is limited to a determination of whether those findings
are supported by substantial evidence. 42 U.S.C. §405(g) ("The
findings of the Commissioner of Social Security, as to any fact,
if supported by substantial evidence, shall be conclusive.");
Schmidt v. Barnhart, 395 F.3d 737, 744 (7th Cir. 2005); Lopez ex
rel Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003). Sub-
stantial evidence has been defined as "such relevant evidence as
a reasonable mind might accept to support such a conclusion."
Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28
L.Ed.2d 852 (1972)(quoting Consolidated Edison Company v. NLRB,
305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).

See also Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003);
Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's
decision must be affirmed if the findings are supported by
substantial evidence and if there have been no errors of law.
Rice v. Barnhart, 384 F.3d 363, 368-69 (7th Cir. 2004); Scott v.
Barnhart, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the deci-
sion cannot stand if it lacks evidentiary support or an adequate
discussion of the issues."  Lopez, 336 F.3d at 539.

Disability insurance benefits are available only to those
individuals who can establish "disability" under the terms of the
Social Security Act.  The claimant must show that he is unable to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be ex-
pected to last for a continuous period of not less than 12
months.  42 U.S.C. §423(d)(1)(A).

The Social Security regulations enumerate the five-step
sequential evaluation to be followed when determining whether a
claimant has met the burden of establishing disability.  20
C.F.R. §404.1520.  The ALJ first considers whether the claimant
is presently employed or "engaged in substantial gainful activi-
ty." 20 C.F.R. §404.1520(b).  If he is, the claimant is not
disabled and the evaluation process is over; if he is not, the

16

ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. §404.1520(e). However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

Mims only raises one challenge to the ALJ's denial of disability benefits, whether his credibility determination was supported by substantial evidence. This court will sustain the

ALJ's credibility determination unless it is "patently wrong" and not supported by the record. Schmidt v. Astrue, 496 F.3d 833, 843 (7th Cir. 2007); Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997); Allord v. Barnhart, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); Arnold v. Barnhart, 473

F.3d 816, 823 (7th Cir. 2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); Scheck v. Barnhart, 357 F.3d 697, 703 (7th Cir. 2004).  If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]."  20 C.F.R. §404.1529(c); Schmidt, 395 F.3d at 746-47 ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence."  SSR 96-7p, at *1.  See also Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004); Carradine v. Barn-

hart, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a signifi-
> cant factor of his or her alleged inability
> to work, the ALJ must obtain detailed de-
> scriptions of the claimant's daily activities
> by directing specific inquiries about the
> pain and its effects to the claimant. She
> must investigate all avenues presented that
> relate to pain, including claimant's prior
> work record, information and observations by
> treating physicians, examining physicians,
> and third parties. Factors that must be
> considered include the nature and intensity
> of the claimant's pain, precipitation and
> aggravating factors, dosage and effectiveness
> of any pain medications, other treatment for
> relief of pain, functional restrictions, and
> the claimant's daily activities. (internal
> citations omitted).
>
> Luna v. Shalala, 22 F.3d 687, 691 (7th Cir.
> 1994)

See also Zurawski v. Halter, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2. See Zurawski, 245 F.3d at 887; Diaz v. Chater, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logical bridge from the evidence to [his] conclusion." Zurawski, 245 F.3d at 887 (quoting Clifford, 227 F.3d at 872). When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting. See Zurawski, 245 F.3d at 888 (quoting Bauzo v. Bowen, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be examined, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

Mims argues that the ALJ's credibility determination lacks any explanation and is not supported by the evidence of record. Mims points to a single statement in the ALJ's decision, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity asserted herein" (Tr. 61), and argues that the ALJ failed to take

into consideration a variety of factors, including the claimant's daily activities, medications and their effects, the frequency and duration of the claimant's pain and symptoms, the factors that aggravate his symptoms, and any other treatment that the claimant employs to relieve pain. However, the ALJ's credibility determination must be assessed by considering his entire explanation. In the same section of the opinion, the ALJ discussed Mims' medically determinable physical and mental impairments, including the claimant's diagnoses of adjustment disorder, diabetes, hypertension, depression, prostate cancer, and difficulty with prolonged standing. (Tr. 60) The ALJ went on to discuss Mims' medications, namely his inhaler and its positive effects in treating Mims' dyspnea. (Tr. 61) The ALJ also addressed Mims' daily activities, ability to care for himself, and limitations in performing such activities. (Tr. 61)

Mims more specifically directs the court to consider whether the ALJ failed to address the frequency, intensity, and aggravating factors of his asthma, stress incontinence, thigh pain, and right arm pain and weakness. However, the ALJ addressed the frequency and intensity of each of these symptoms in his opinion. The ALJ noted that Mims had asthma that was significantly improved by use of his inhaler prior to exerting himself, thereby decreasing the frequency and severity of this disorder. (Tr. 61)

The ALJ discussed that Mims' incontinence was periodic and was taken into consideration when the ALJ determined Mims' postural limitations in the RFC. (Tr. 62) The ALJ also considered the thigh pain Mims experienced and relied on the medical evidence and Mims' testimony to conclude that it was periodic, resolved with rest, and that this pain could be due in part to deconditioning. (Tr. 61)

Finally, in addressing the pain Mims complained of in his right arm, the ALJ concluded that this complaint was not substantiated by any medical evidence of record. (Tr. 62) The ALJ must consider the claimant's complaint of pain if it is supported by medical signs and findings. Clifford, 227 F.3d at 871. "[T]here must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." 20 C.F.R. §404.1529. When, as here, the claimant's complaint was not supported by medical evidence, the ALJ must obtain descriptions of the claimant's ability to perform daily activities and consider prior work

record information, observations by treating physicians, observations of third parties, and any medications taken to relieve the pain.  Clifford, 227 F.3d at 871-72.

Here, the ALJ considered Mims' daily activities and limitations in making his RFC determination.  The ALJ noted that Mims did not pursue treatment for his right shoulder and that his physicians did not consider it a priority.  The medical records contain no explanations or medical findings that would reasonably be expected to result in the right arm pain Mims complained of.  See 20 C.F.R. §404.1529.  For these reasons, the ALJ's determination that his right arm pain was not disabling was supported not only by the absence of medical records but also by Mims' own failure to pursue treatment.  This indicates that the severity of pain did not rise to the level to render Mims disabled.  In any case, Mims first reported his pain to a doctor after the time he was last insured and is not covered under the Social Security Act for this injury.  See Eichstadt v. Astrue, 534 F.3d 663, 667 (7th Cir. 2008) (denying the claimant's application because she failed to produce any medical evidence suggesting the presence of a disabling impairment at any time prior to the expiration of her insured status).  For these reasons, substantial evidence of record supports the ALJ's decision to discredit Mims' testimony with regard to his right arm pain.

In making his credibility determination, the ALJ considered all of the factors outlined in SSR 96-7p that Mims complained were not considered. The ALJ addressed Mims' daily activities, the relief his medication provided, and the frequency of his symptoms. His decision is therefore supported by substantial evidence of record, and the decision of the ALJ is AFFIRMED.

ENTERED this 18th day of January, 2011

s/ Andrew P. Rodovich
United States Magistrate Judge